IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES CASHAW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 13−cv−1337−MJR−SCW |
| | ) |
| NURSE WILLARD, | ) |
| TERRY, | ) |
| MILLER, | ) |
| SHELA BECKMAN, and | ) |
| MELISSA LITTRELL, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

Plaintiff, currently incarcerated at Big Muddy Correctional Center, filed this cause of action on December 26, 2013 while incarcerated at Shawnee Correctional Center, alleging that Defendants were deliberately indifferent to his diabetes. (Doc. 1). Upon threshold review, the Court determined that Plaintiff had stated two claims: the first against Defendants Willard, Terry, Miller, Littrell, and Beckman for deliberate indifference for ignoring or rejecting Plaintiff's request for refills of his diabetes medication and for deliberate indifference to medical needs; and the second against Defendants Johnson and Swalls for denying Plaintiff permission to go to the Health Care Unit. (Doc. 8). Swalls and Johnson were ultimately dismissed for failure to exhaust administrative remedies, leaving only the first claim in this litigation. (Doc. 36).

On September 25, 2015 Defendants Beckman, Littrell, Miller, Terry and Willard filed a motion for summary judgment. (Doc. 62). The Court then granted Plaintiff an extension of time to reply until November 30, 2015. (Doc. 66). On November 10, 2015, Plaintiff filed a memorandum of law in opposition to the Motion. (Doc. 71).[1] Defendants then filed a Reply on November 13, 2015. (Doc. 72).

## BACKGROUND

Dr. David diagnosed Plaintiff with diabetes in 2012. (Doc. 63-1, p. 3). Specifically, the medical records reflect that Plaintiff was diagnosed on March 13, 2012 and prescribed Metformin. (Doc. 63-2, p. 16). His HbAIC level was 9.8. (Doc. 63-2, p. 17). Plaintiff recalls that David told him he had Type I diabetes and that they had a conversation about Plaintiff's diet. (Doc. 63-1, p. 3). The records reflect that Plaintiff had Type II diabetes as of March 13, 2012. (Doc. 63-1, p. 17). David submitted an affidavit that he diagnosed Plaintiff with Type II diabetes. (Doc. 63-3, p. 1). Plaintiff's filings confirm that he was diagnosed with Type II diabetes. (Doc. 71, p. 3)

Plaintiff told David that most of his diet was from the commissary because he did not like the prison's soy food. (Doc. 63-1, p. 3). David told Plaintiff to limit his sugar and eat as many vegetables as possible. (Doc. 63-1, p. 4). Plaintiff believes that

---

[1] Plaintiff continues to make reference to Johnson and Swalls in his filings. Plaintiff has waived any arguments as to them by failing to file a response to their motion for summary judgment. That summary judgment motion has been ruled on and Plaintiff may file an appeal as to those defendants at the close of this case.

his diabetes was very mild when it was first diagnosed. (Doc. 63-1, p. 4). Plaintiff has a history of diabetes; his father was an insulin dependent diabetic. (Doc. 63-1, p. 4).

Plaintiff attended a diabetes chronic care clinic on July 2, 2012. (Doc. 63-1, p. 4; Doc. 63-2, p. 31). He reported numbness in his big toe. (Doc. 63-1, p. 5; Doc. 63-2, p. 31). Plaintiff's HbAIC level was 6.7. (Doc. 63-2, p. 31). HbAIC levels provide an average blood sugar level over the preceding three month period. (Doc. 63-3, p. 1). An HbAIC level of under 7 shows good control; conversely, if the level is above 9, control is poor. (Doc. 63-3, p. 2). The records noted Plaintiff was obese and that diet and exercise were discussed with him. (Doc. 63-2, p. 31). The report notes that Plaintiff has Type II diabetes and notes the current control is "good." (Doc. 63-2, p. 32).

Plaintiff was on Metformin from July through September, at which time he ran out. (Doc. 63-1, p. 5). By October, Plaintiff was experiencing dry mouth, thirst, constant urination, difficulty keeping down food, and mid-back pain. (Doc. 63-1, p. 5). A medication record showed that Plaintiff was dispensed "60" metformin on July 2, 2012. (Doc. 71-2, p. 3). The record further reflected that Plaintiff was to take two a day. (Doc. 71-2, p. 3). The record is unclear as to whether that refers to a 60 day supply or 60 pills.

In order to renew a prescription, an inmate would have to peel off a sticker from the prescription seven days before it expired, put it on a request slip, and send the slip to the health unit. (Doc. 63-1, p. 13). Plaintiff alleges that he took these steps, but that prisoners' prescriptions would frequently go unfilled. (Doc. 63-1, p. 13). Other than his Metformin, Plaintiff submitted no other evidence of prescriptions going unfilled.

3

Plaintiff spoke to Laura Miller in September regarding his medication because he had not received a refill of his Metformin. (Doc. 63-1, p. 7). She told him that she would look into the issue, but never got him his medication. (Doc. 63-1, p. 7). Plaintiff specifically went out of his way to go to the pharmacy room and ask to speak to Miller. (Doc. 63-1, p. 7). Miller had been helpful to Plaintiff on several past occasions. (Doc. 63-1, p. 7). Plaintiff did not describe his symptoms to her, but stated that he was not feeling well. (Doc. 63-1, p. 9). Miller does not recall Plaintiff telling her that he was not getting his Metformin between September 2012 and November 2, 2012. (Doc. 63-5, p. 1). The medical records do not reflect that Plaintiff saw Miller. (Doc. 63-5, p. 1).

Plaintiff also spoke to Terry Beegle ("Terry") about his medication on many occasions. (Doc. 63-1, p. 8). At least one of those occasions was around November 2012. (Doc. 63-1, p. 8). Terry told him that he would look into it but never got back to him. (Doc. 63-1, p. 8). Plaintiff did not discuss his symptoms with Terry. (Doc. 63-1, p. 9). Terry submitted an affidavit stating that he did not recall speaking to Plaintiff regarding his Metformin during September 2012 through November 2, 2012. (Doc. 63-4, p. 1). The records do not reflect that Terry saw Plaintiff during this time. (Doc. 63-4, p. 1).

Plaintiff spoke to Beckman and Sherri Lynn about two weeks before he got his medication. (Doc. 63-1, p. 8-9). They told him they would look into it, but they never got back to him. (Doc. 63-1, p. 9). Plaintiff spoke to Beckman one time in passing. (Doc. 63-1, p. 9). Plaintiff assumes that she did nothing because he did not experience any

4

results. (Doc. 63-1, p. 9). Beckman has no recollection of speaking to Plaintiff regarding his Metformin during September 2012 through November 2, 2012. (Doc. 63-6, p. 1).

In November 2012, Plaintiff went to health care and told Willard that he had not been receiving his medication. (Doc. 63-1, p. 5). Willard checked the records and immediately gave Plaintiff some Metformin. Plaintiff testified that she told him "somebody dropped the ball." (Doc. 63-1, p. 5). Plaintiff testified that Willard "did an excellent job." (Doc. 63-1, p.8). The medical records reflect that Plaintiff was issued 60 Metformin 1000 mg pills on November 2, 2012. (Doc. 63-2, p. 133).

The Metformin had no effect on Plaintiff's symptoms, according to Plaintiff. (Doc. 63-1, p. 5). Plaintiff says that he took Metformin consistently until he was taken to the outside hospital. (Doc. 63-1, p. 7).

Plaintiff went to the chronic clinic for diabetes again on November 5, 2012. (Doc. 63-1, p. 6). He recalls seeing Terry Beegle, but alleges that nothing Terry did helped him at all.[2] (Doc. 63-1, p. 6). Plaintiff's HbAIC levels at that visit were 6.7. (Doc. 63-2, p. 40). Because the HbAIC level was under 7, Plaintiff's diabetic control was described as "good" on this visit. (Doc. 63-2, p. 41). The records also reflect that Plaintiff was given a low bunk/low gallery permit at that time by Terry. (Doc. 63-2, p. 40, 134). Plaintiff was listed as having Type II diabetes. (Doc. 63-2, p. 41).

---

[2] Plaintiff's complaint does not state a claim against Terry for this visit.

5

Plaintiff alleges that he felt continuously ill from November 2012 until April 2013, when he was seen at health care because he reported vomiting and nausea for two weeks. (Doc. 63-1, p. 5-6). Plaintiff testified that he begged the sergeant to allow him to go to health care on an emergency basis and by that time he was barely able to walk. (Doc. 63-1, p. 6). Dr. Ramesh Guthikonda, who treated Plaintiff at Heartland Regional Medical Center, charted that Plaintiff had been complaining of his symptoms for one week. (Doc. 71-1, p. 13). The medical records reflect that Plaintiff had begun complaining about mobility issues prior to the time that he was allegedly deprived of Metformin; for example, on July 2, 2012, Plaintiff requested that he be issued a wheelchair due to arthritis in his left knee. (Doc. 63-7, p. 9). Plaintiff was also seen at health care several times between his clinic visit and the April 2013 incident—for instance, he was seen for a cold on December 24, 2012 (Doc. 63-7, p. 29), and for muscle pain on January 9, 2013. (Doc. 63-7, p. 31). Plaintiff also told Dr. Guthikonda that his diet prior to the April 2013 incident was juice, sugars, and bananas. (Doc. 71-1, p. 13).

Plaintiff was admitted to the prison infirmary on April 4, 2013. (Doc. 63-1, p. 10). It appears that he saw Nurse Linda Runquin at 2pm on April 4, 2013. (Doc. 63-7, p. 34). She noted that Plaintiff appeared weak and lethargic, and he complained of vomiting. (Doc. 63-7, p. 34). Plaintiff was admitted to the infirmary due to vomiting, and his medications were continued. (Doc. 63-7, p. 34). Plaintiff's blood sugar was 524 at 2pm. (Doc. 63-7, p. 34). The nurse assessed Plaintiff as having hyperglycemia and labs were

ordered. (Doc. 63-7, p. 34). Ultimately, Plaintiff's glucose was measured at 732 and his HbAIC level was 15.7. (Doc. 63-3, p. 2).

Plaintiff testified that he saw Littrell. (Doc. 63-1, p. 10). Littrell was working as an RN on the 7 am to 3 pm shift. (Doc. 63-10, p. 1). Littrell documented that she saw Plaintiff at 2:20 pm on April 4, 2013 and that she reported his condition to the doctor, noted the lab order, and placed Plaintiff in bed 4. (Doc. 63-7, p. 35; Doc. 63-10, p. 1). Plaintiff testified that Littrell did not believe that he was ill. (Doc. 63-1, p. 10). Plaintiff informed her that he was sick and he thought he needed some potassium. (Doc. 63-1, p. 10). He asked if he could have some bananas. (Doc. 63-1, p. 10). Littrell replied, "I don't know what you need potassium for. You are not sick." (Doc. 63-1, p. 11).

Instead, Littrell brought a syringe of medication. (Doc. 63-1, p. 10). Although the medical records show that Littrell gave this shot at approximately 8:00 am on April 5th, (Doc. 63-7, p. 43), Plaintiff insists that he got the shot at around 2 pm on April 4th. (Doc. 63-1, p. 12). David submitted an affidavit that he ordered 8 units of insulin at 8:10 am on April 5. (Doc. 63-3, p. 2; Doc. 63-10, p. 2). After the injection, Plaintiff experienced swelling, cramps, and dizziness. (Doc. 63-1, p. 10). He also alleges that he experienced some paralysis, but also alleges that he almost fell when he stood up. (Doc. 63-1, p. 10). Plaintiff believes that he is allergic to "regular" insulin based on this experience. (Doc. 63-1, p. 10). No medical provider has ever told him that he is allergic to insulin. (Doc. 63-1, p. 11). Plaintiff concedes that the April 2013 incident is the first time he had insulin and there was no way Littrell could have known whether he was allergic. (Doc.

7

63-1, p. 11). Plaintiff alleges that Littrell let him sit in the infirmary in pain for "a long time." (Doc. 63-1, p. 11). Littrell came back later and gave Plaintiff some medication. (Doc. 63-1, p. 12). Plaintiff alleges that Littrell was not professional. (Doc. 63-1, p. 13).

The records reflect that Littrell received a call from the lab regarding Plaintiff's glucose level of 732 at 7:05 am on April 5, 2013. (Doc. 63-7, p. 40; Doc. 63-10, p. 1). She reported those results to David. (Doc. 63-7, p. 40; Doc. 63-10, p.1). Littrell then examined Plaintiff at 7:45 am (Doc. 63-10, p. 1), at which time he said that he couldn't keep anything down, but that he could eat fruit, jello, and milk. (Doc. 63-7, p. 40). Littrell reported to David again at 8:10 am. (Doc. 63-7, p. 41; Doc. 63-10, p. 2). He told her to administer 8 units of insulin. (Doc. 63-7, p. 43; Doc. 63-10, p. 2). Littrell did so at 8:15 am, and her note says that Plaintiff tolerated the insulin well (Doc. 63-7, p. 47).

At approximately 2:15 pm on April 5, Plaintiff complained of cramping to Nurse Cowgill. (Doc. 63-7, p. 47). She also reported that Plaintiff was unsteady, cold, and clammy, and that his blood sugar was at 499. (Doc. 63-7, p. 47). Plaintiff complained to Littrell regarding the cramps at 2:30 pm. (Doc. 63-7, p. 48). Littrell also charted that Plaintiff's blood pressure was dropping and notified David. (Doc. 63-7, p. 48; Doc. 63-10, p. 2). At 2:45 pm, Littrell received instructions from David to send Plaintiff to the Heartland Regional Medical Center via ambulance and to start an IV. (Doc. 63-7, p. 48; Doc. 63-10, p. 2). She notified security at 2:50 pm. (Doc. 63-7, p. 49).

Plaintiff was admitted to Heartland Regional Medical Center and diagnosed with hyperosmolar hyperglycemia (a complication of diabetes where high blood sugar

8

causes dehydration) and acute renal failure (a condition which can result from dehydration in which the kidneys cannot filter waste from the blood). (Doc. 63-3, p. 3). While at the hospital, Plaintiff received a CT of his abdomen; it noted a 7 mm hypodensity in the mid pole of his right kidney. (Doc. 63-7, p. 152). The impression was that the density might be a cyst. (Doc. 63-7, p. 152). Plaintiff was at Heartland Regional until April 8, 2013. (Doc. 63-3, p. 3; Doc. 63-7, p. 50). The discharge diagnosis was 1) nonketotic hyperosmolar state acute renal failure, resolved; 2) hypertension; 3) diabetes mellitus, insulin dependent; 4) hypercholesterolemia. (Doc. 63-7, p. 174). Plaintiff was instructed to take Lantus 30 units in the evening, Humalog 6 units with each meal, and Pepcid 20 mg a day. (Doc. 63-7, p. 174). He was to continue on aspirin, lopid, Lopressor, and Omega-32. (Doc. 63-7, p. 174). Plaintiff was to discontinue Vasotec, hydrochlorothiazide, and metformin. (Doc. 63-7, p. 175). The hospital did not recommend or prescribe any medications for kidney damage or failure.

On April 9, 2013, the records reflect that Plaintiff complained that he had not received his Metformin for 3 months despite requests. (Doc. 63-7, p. 52). Initial checks revealed medical pick-up forms were missing for November 2012, December 2012, and February 2013. (Doc. 63-7, p. 53). Further checking showed that Plaintiff's Metformin supply was given out for November 2012, January 2013, and February 2013, and that Plaintiff submitted his sticker in December 2012 and March 2013. (Doc. 63-7, p. 53).

After he returned from the hospital, Plaintiff was dependent on insulin to control his diabetes. (Doc. 63-1, p. 17). It took several months for the doctors to determine the

9

proper medication, and Plaintiff experienced several blood sugar spikes during that time.  (Doc. 63-1, p. 17).  Doctors struggled to bring Plaintiff's diabetes into "good" control, and most of the time the control was "fair" or "poor."  (Doc. 63-3, p. 3).

David discharged Plaintiff from the infirmary on April 15, 2013.  (Doc. 63-7, p. 69).  The discharge summary notes Plaintiff's history of hyperglycemia and renal failure.  (Doc. 63-7, p. 69).  It also notes that Plaintiff remained asymptomatic in the infirmary and that his physical examination on discharge is unremarkable, other than for obesity.  (Doc. 63-7, p. 69).  The discharge instructions made no mention of permanent kidney damage or prescribed any treatment on that basis.  (Doc. 63-7, p. 69).

Plaintiff alleges that he suffered permanent kidney damage as a result of being without his medication, and that he takes a pill to address his kidney damage.  (Doc. 63-1, p. 18).  Plaintiff's medical records do not reflect that he is on medication for kidney damage.  (Doc. 63-3, p. 4).  Plaintiff could not remember the name of the pill and referred to his records.  (Doc. 63-1, p. 18).  Plaintiff alleges that David told him that diabetes can cause kidney damage because insulin is needed to protect organs.  (Doc. 63-1, p. 18).  David explicitly told Plaintiff that he had to take his medication to save his organs.  (Doc. 63-1, p. 18).  Plaintiff alleges that he experiences pain in his left and right side as a result of kidney damage.  (Doc. 63-1, p. 18).  Plaintiff's response indicates that he takes Lisonpril for his blood pressure and also for his kidney.  (Doc. 71-1, p. 2).

Plaintiff alleges that David told him that if he had not missed his medication, he would have never progressed from a Type 1 diabetic to a Type 2 diabetic.  (Doc. 63-1, p.

10

19). David disputes this opinion. In David's medical opinion, Plaintiff's hyperosmolar hyperglycemia, acute renal failure, and subsequent insulin requirements were the result of a natural progression and worsening of Plaintiff's diabetes condition, and receiving medication from September 2012 through November 2, 2012 would not have stopped Plaintiff's diabetes condition from worsening. (Doc. 63-3, p. 4).

## LEGAL STANDARDS

### 1. Summary Judgment Standard

Summary judgment is proper if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Dynegy Mktg. & Trade v. Multiut Corp.*, **648 F.3d 506, 517 (7th Cir. 2011)** (*citing* **FED. R. CIV. P. 56(a))**. The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and information obtained via discovery—the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986)**. In determining whether a genuine issue of material fact exists, the Court must view the record in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986)**.

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, **528 F.3d 508, 512 (7th Cir. 2008)**.

## 2. Eighth Amendment Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishment" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005)**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm, but he is not entitled to demand specific care. *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).** The first prong looks at whether the prisoner has shown that he has an objectively serious medical need. *Id.* A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652–53.**

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* The plaintiff need not show that the physician literally ignored his complaint, just that the physician was aware of the serious condition and knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).** Courts give deference to physicians' treatment decisions, since "there is not one proper way to

12

practice medicine, but rather a range of acceptable courses." *Jackson v. Kotter*, **541 F.3d 688, 697–98 (7th Cir. 2008)**. A doctor who chooses one routine procedure over another does not violate the Eighth Amendment. *McGowan v. Hulick*, **612 F.3d 636, 641 (7th Cir. 2010)**. *See also Estelle*, **429 U.S. at 107 (whether additional techniques or treatments were needed was a "classic example of a matter for medical judgment")**.

## DISCUSSION

It is undisputed by the parties that Plaintiff's diabetes constitutes a serious medical need. Defendants have argued that the evidence shows that Plaintiff did not suffer harm from the denial of his blood pressure medication because Plaintiff's control of his diabetes was still in the "good" range after the period in which Plaintiff was without his medication. However, Plaintiff may be entitled to receive nominal and punitive damages due to "probabilistic" injury absent a showing of physical or psychological injury. *E.g., Thomas v. Illinois*, **697 F.3d 612, 614-615 (7th Cir. 2012)**; *Turner v. Pollard*, **564 F. App'x 234, 239 (7th Cir. 2014)**; *Wright v. Miller*, **561 F. App'x 551, 555 (7th Cir. 2014)**. The probability of injury is enough, even without physical or psychological harm. And this case presents significant questions of fact on this point. While the Court believes Defendants are correct that Plaintiff will not be able to show that the denial of medication from September 2012 until November 2012 caused the injuries he complains of in April 2013, that is a causation issue best addressed by a motion in limine, and not by a motion for summary judgment.

1. **Defendants Terry, Miller, and Beckman**

Plaintiff alleges that he told Terry, Miller, and Beckman about the fact that he was going without his medication. He also testified to these facts in his deposition. The Defendants have individually submitted affidavits on summary judgment stating that they do not recall interacting with Plaintiff during the relevant time period. These affidavits cannot carry the day at the summary judgment phase. There is a genuine issue of material fact as to whether Defendants Terry, Miller, and Beckman had the requisite subjective mental state. If a jury found Plaintiff's credible, they could infer that Terry, Miller, and Beckman were deliberately indifferent when Plaintiff told them he was out of medication, even though it was in their power to act. For these reasons, Plaintiff's claims against Terry, Miller, and Beckman survive.

2. **Defendant Willard**

Plaintiff's complaint alleges that he told Willard prior to November 2, 2012 that he was out of his medication. But Plaintiff did not offer any testimony that he spoke to her personally. Instead Plaintiff's testimony was that he followed the prison's procedure for turning in his prescription refills and that he presumes that Willard ignored them. The procedure requires Plaintiff to take a sticker off his pill packs and put it on a request to the health care unit by putting such request in the bars of his cell. Plaintiff did not testify that Willard herself picked up the request slip.

A reasonable jury could not conclude that Willard was deliberately indifferent on this evidence because the medicine request slip would not have gone straight to Willard

14

but would have been in the custody of guards or other prison staff in between Plaintiff's cell and the pharmacy. A non-party could have lost the medication request slip. Plaintiff has not submitted sufficient evidence that Willard knew that he suffered from a serious medical need. In fact, his testimony that when Willard was informed that he was without his Metformin, she immediately acted to get Plaintiff his medication and in his own words "did an excellent job." That conduct does not qualify as deliberately indifferent. Willard is entitled to summary judgment in her favor.

### 3. Defendant Littrell

Plaintiff argues that Littrell was deliberately indifferent because she told him that he was not sick, refused to give him a banana, and gave him an injection of insulin that made him feel sick, from which Plaintiff concludes that he is allergic to insulin. Plaintiff also testified that Littrell left him sitting around in pain. Even crediting Plaintiff's testimony on these points, Littrell has submitted evidence that she was working behind the scenes to secure Plaintiff care. Littrell got Plaintiff's lab results back, called the doctor, took orders from the doctor, administered medication, and ultimately made arrangements to transfer Plaintiff to an outside facility. Plaintiff may have wanted a banana and disliked Littrell's attitude, but that is not deliberate indifference. The evidence shows that Littrell did much to manage Plaintiff's care, and many of her actions took place out of Plaintiff's sight. No reasonable jury could infer from this evidence that Littrell was deliberately indifferent to Plaintiff's condition.

15

The Court does not accept Plaintiff's testimony that he is allergic to insulin because Plaintiff has no medical training that would allow him to make that diagnosis. Once more, that assertion is not supported by Plaintiff's medical records or common sense, as Plaintiff's diabetes has been controlled by insulin since April 2013. There is also evidence that Plaintiff was suffering from kidney shut-down, dehydration, and low blood pressure at the time he claims that the insulin shot made him feel sick. Those problems are enough to make any person feel sick. Finally, even if the Court accepted Plaintiff's representation as true, Plaintiff concedes that the shot was the first time that he had ever been injected with insulin, and therefore Littrell could not have known that he was allergic to it. In any event, Littrell did not make the decision to give Plaintiff the shot, but was merely following David's orders. On these facts, no reasonable jury could conclude that Littrell was deliberately indifferent when she gave Plaintiff a shot of insulin. Littrell is entitled to summary judgment in her favor.

## Conclusion

For the foregoing reasons, the motion for summary judgment (Doc. 62) is **GRANTED** as to Defendants Willard and Littrell. The Clerk of Court is instructed to dismiss them as parties and enter judgment in their favor at the close of this case. The motion for summary judgment (Doc. 62) is **DENIED** as to Defendants Beckman, Miller, and Terry. Plaintiff's claims against Beckman, Miller, and Terry will proceed to trial.

**IT IS SO ORDERED.**

**DATED:  March 11, 2016**

> /s/ **Michael J. Reagan**
> **Chief Judge Michael J. Reagan**
> **United States District Court**

17